May it please the court, I'm Assistant Attorney General Priyanka Gupta, and I represent the Defendant's Appellant, the Acting Director of the Department of Corrections. I'd like to reserve three minutes for rebuttal. After months of negotiations, the parties and entered into an agreement in which the Department agreed to confer a host of services and benefits on deaf and hard-of-hearing inmates. This case involved the interpretation of that compromise. Relevant here, the Department agreed to timely refer inmates to audiologists, and it limited the circumstances in which the magistrate judge could intervene to enforce the agreement. This court should reverse and vacate portions of the magistrate judge's orders, enforcing the agreement for two reasons. First, the magistrate judge entered new obligations into the agreement by imposing deadlines for the completion of audiological evaluations. And when he entered sanctions against the Department. To start, the magistrate judge's orders adding deadlines for the completion of audiological evaluations contradicts the plain text of the agreement. The Department agreed to provide many services in the individualized process of providing deaf and hard-of-hearing inmates with accommodations. They first conduct hearing screenings within 30 days in which a nurse evaluates the inmates to see whether they are deaf and hard-of-hearing, and then a doctor evaluates the inmates as well. They then refer the inmates to audiologists. This also involves scheduling the appointments with audiologists, rescheduling the appointments if those are canceled, and transporting inmates to the audiologists for care. They then make reasonable efforts to obtain the results of those evaluations from the audiologists. And then after this, within 30 days, they make sure that the inmates undergo the final stage of the assessment, the auxiliary services and AIDS assessments. What's the status today of the 700 inmates who at one point were required to receive the evaluations by August 28th of 2020? Yes, Your Honor. Although this court stayed, the magistrate judge's order, the Department has re-referred all of those inmates that were interested in seeing audiologists to because they had already gone through this process. Some were then seen by audiologists and found to be not deaf and hard-of-hearing and so lost their accommodations. Others have seen audiologists or are waiting to see audiologists. So what percentage of those that wish to see and were referred have been completed? I apologize, Your Honor. I don't have that number, but I can get it for this court if that would be useful. But I do know they've all been referred and that the pandemic has been delaying the completion of these appointments. For a while, the Department had to seize all non-emergency medical appointments in the beginning few months of the pandemic and has since lifted that stay. But all doctor's offices are backed up for both the general public and the inmates as well. And so that's been adding a delay. Scupta, suppose you had a situation where your Department referred a prisoner to an audiologist and nothing happened. Nothing happened for a very long time. What is the obligation at that point to that prisoner? Times your briefs seems to suggest you don't have any obligation. And I'm kind of concerned about that. Yes, Your Honor. We think under the referral provision, we would have an obligation to re-refer the inmate to an audiologist who would be willing to see the inmate because when these audiologists accept these referrals, they enter it into a contract with Wexford that they are going to see the inmates. And as part of the referral process, we also schedule appointments with the audiologist. So we do think the referral provision of the agreement would protect against such a situation. For example, there might be a showing then that the Department was acting negligently and only referring inmates to audiologists who had no availability or no availability for years or by only referring them and not making sure they had an appointment. So we do think those concerns are addressed. Ms. Scupta, can I pick up on Judge Ripple's question? Because I think it goes right to the heart of this. Would you at a minimum agree that the referral brings with it an Yes, Your Honor. We do agree with that reading and that's why audiologists... Okay. And then at what point, just give me a hypothetical. You can pick an easy one. At what point would your best efforts obligation be breached? So assume non-COVID. Okay. Give me a hypothetical where you think it would clearly be breached. Yes, Your Honor. So if we had referred an inmate to an audiologist, the audiologist canceled the appointment. We scheduled a new appointment with that audiologist and that audiologist canceled the appointment a second time. And then we made no effort to refer this inmate to a different audiologist who perhaps would not keep canceling the appointment. I believe that would be a breach of the agreement under the referral provision. There have been no allegations that the Department is not complying with its obligations under the referral provision or the other steps of this process. So the Department does expect these evaluations to occur and it agreed to commit a significant amount of resources. The problem here is that we would not have agreed to ensure that the evaluations are completed by a certain timeline because that's without our control. And so that's why the agreement was written how it was. And we made this concern clear to plaintiffs during the negotiations, that's undisputed, that we told them we can't control the audiologist's schedules. So our intention here is not to frustrate the process. We would not have committed all these resources if that were the case. And we do try to guard against some of these concerns through the referral process. Ms. Kopsa, let me ask you another question that surprises me and you can tell me I'm mistaken. I expected when I read your briefs to see the word COVID on every third line. And I'm not so sure it's mentioned once in your reply brief. Should I be surprised by that? Or you'd say, no, that's a mistaken reaction. COVID really doesn't have any bearing on any of this. No, Your Honor. The reason we didn't bring up COVID is because the agreement was still written in this way, regardless of whether there was a pandemic or not, that we can't control the schedules of audiologists. And that concern exists in any time. It's especially prominent right now when medical care is so delayed because of the pandemic. But even before the pandemic hit, and even hopefully when it ends, that concern is still going to be present. And that's why the argument It surprises me, though, that you take that position. And it's yours to take, not mine. But the reason that I'm surprised by that is I would have thought you would have argued that initially, in your view, there should be no time limit. If there is going to be a time limit, the time limit has to account for the circumstances at the present time. And those circumstances are one where we're in a major health pandemic. Your Honor, we do agree that if there is a time limit, it should account for those circumstances. And we believe that both with a pandemic and without 90 days, it's simply too short for us to guarantee. But the reason we didn't grapple with a particular timeline is because in any setting, we would not have agreed to the agreement with this new obligation that the magistrate judge added in because even during normal times, we struggle to have audiologists willing to treat the inmates. And in fact, in December of 2020, this is document 640 of the record, the department filed a status report with the district court showing that had contacted 767 audiologists in Illinois. Those were all the ones with Illinois addresses. And they could only add 13 new providers. And so that is why the department was concerned in the first instance, pandemic or not, that it wouldn't be able to guarantee these time frames. And that's not, again, because we don't think the evaluations will ever be committed or we are negligently referring inmates to audiologists who will take a long time in seeing them. That simply reflects the practical difficulties in our experience in ensuring when these evaluations happen. My assumption is that the inmates have to go to the audiologist. Is that correct? Or is it the other way around? Yes, the audiologists so far have refused to come to the facilities and that would also require a structural change such as a soundproof booth with specialized equipment. So the department transports the inmates to the audiologist facilities. And as explained in the Wexford affidavit that's document 548-1 of the record, audiologists have concerns about seeing inmates on the same day as members of the general public because of security risks. Some have concerns about seeing inmates from more than one facility. And so because of a host of practical difficulties and because of concerns on the audiologist's part, although we do transport the inmates even when the facilities are more than an hour away, there are many factors for why the audiologists are not able to see the inmates as quickly as they would like. I would note that, this is paragraph 37 of the agreement, when an inmate walks in who is clearly deaf and needs accommodations right away, the department can bypass this whole process and get them to the last stage right away, the auxiliary aids and services assessments. So the agreement does contemplate for circumstances when there would be urgent accommodations needed and the department agreed to provide those accommodations. So all of this goes to show, in fact, there are at least 23 explicit deadlines of obligations. These are detailed on page 23 of our brief that the department agreed to undertake. So the parties clearly knew how to write out these obligations and deadlines. And they chose not to do so here. And this court has made clear that interpreting contracts, it does not add terms that the parties could have easily added. Rather, it gives effect to the plain text of the agreement. And this is the compromise the parties reached. And so because the magistrate judges inserted new terms into this compromise, it was contrary to these fundamental principles of contract law and should be vacated. I know that I'm reaching my rebuttal time. I'd also like to note that we are challenging the magistrate judge's entry of sanctions against the department. The parties did meet and confer about the use of licensed hearing instrument dispensers and the department corrected that procedure before the plaintiffs filed their motion to enforce. So under the terms of the agreement, judicial intervention was not permitted. And although we rely on their view of the department's bad behavior and justified sanctions, this agreement does not provide for sanctions in such a circumstance. So because we voluntarily resolved this issue to the magistrate judge himself, for example, on page 6 of his order characterized as a prior practice, sanctions were not warranted here. If there are no further questions, I'd like to reserve the remainder of my time for a vote. Thank you, Ms. Gupta. Mr. Michaels? Good morning. Bob Michaels of Winston & Straughan on behalf of the plaintiffs at Belize here. There are two violations that the judge found below that are at issue on appeal here. We refer to them in our brief as the LHID violation and the timeliness violation. I'd like just to briefly address each of those violations. We believe they're both well sustained by the record as well as by the settlement agreement here. The LHID violation is a particularly egregious violation. It deals with the audiological evaluation, which is the lynch pin of all the individualized rights and services that inmates are provided under this settlement agreement. Without the audiological evaluation determining that the inmate is in fact deaf or hard of hearing, has a hearing impairment, the individual receives none of the individualized rights and services he's entitled to through the auxiliary aids and services assessment, his communication plan, etc. All those things get kicked into place once he has the audiological evaluation. So denying him a proper audiological evaluation, either by not doing it timely or just by not doing it at all, or by using an LHID as they did in the first violation, is particularly egregious. That violation is undisputed. It's not challenged below. It's not challenged here before the court. IDOC admitted that right after they executed this settlement, immediately after that, starting in July of 18, they started sending inmates 700 to LHIDs, licensed hearing instrument dispensers, or basically hearing aid dispensers, not to licensed audiologists to do a proper audiological evaluation. They did that for one year from July 18 to July of 19. They did it with 700 inmates, and they've admitted both below and on appeal here that that was a violation. They can't do it. It was a substantial violation of the settlement that kicks in the provision in the settlement that says when they're in substantial noncompliance, then the court can enter remedies. That's all not in dispute. Also not in dispute on the LHID violation is a lot of the order the judge, a lot of the relief the judge ordered. The judge ordered five components of relief there. He said going forward, number one, you need to use only audiologists, not LHIDs to do all audiological evaluations. Number two, I'm going to extend the settlement for a year because of this violation. Number three, you have to retest all these people with proper audiological evaluations by a licensed audiologist. Those three areas of relief are not contested on appeal and should not be disturbed by this court. The only two aspects of the relief of that violation they contest are the fact that they had to do that retesting of those 700 inmates by August 28th, which was about 11 weeks after the judge issued his order and the sanction that the judge ordered pursuant to the settlement provision that says when they're in substantial violation of the agreement, the court can order that they pay our plaintiffs fees for investigating and litigating that violation because they've caused us as monitors of the settlement to do work. So those are the only things they challenge on the order and they challenge it on one argument that has two parts to it. Their argument is, A, those are not ongoing violations, they are past violations, and B, the judge has the power under the settlement agreement to address only ongoing violations, not past violations. They're grossly wrong on both of those points. And to the question the court asked about the status of those inmates, first of all, the response from counsel is completely outside the record. The record before the court at the time this was filed is that none of those individuals had received any audiological evaluation by a licensed audiologist. That was the record at the time our motion was filed. That was the record at the time the judge issued his ruling. That was the record at the time the appeal was filed. Matter of fact, when briefing this appeal, including in the stay briefing, they argued that they are not doing that and they couldn't do it in any kind of time frame. So the record is those folks are sitting there day after day, month after month, with no proper audiological evaluation in violation of the settlement. That's not a past violation. That is an ongoing violation. Even if there's one or two of the 700, it's an ongoing violation. But we believe a substantial number, if not most of the 700, have never received the proper audiological evaluation. That is nowhere in the record before this court. So the court should assume, I believe, that none of that has happened. And that is an ongoing violation. They've argued that, well, we stopped referring people to licensed hearing instrument dispensers in July of 19. Therefore, it's over. We're not doing it anymore. All that means is that they're not committing more violations with more people beyond the 700. It doesn't mean that the 700 violations are over. They haven't been corrected in this record. And those inmates are sitting there day after day, suffering that violation. So that's clearly an ongoing violation. Secondly, they're wrong on the fact that even if it were a past violation, that the judge doesn't have the ability to resolve that or enter relief on it. He clearly does. The provision of the agreement, pursuant to which the judge can order relief, clearly says that if IDOC has been in substantial noncompliance with the settlement, the court could then enter whatever relief, in very broad language, whatever relief the court deems necessary in order to ensure their future compliance with the agreement. Mr. Michaels, can I get the benefit? I think you're making a bunch of fair points. You're doing it quite well. I've got a question for you, though, about the 90 days. My concern is that the 90 days may not have any reality in the current health situation. Yeah, let me address. So I think I'm pretty much done with the LHID violation. I think you're turning to the timeliness violation. I think the LHID violation is both rock solid because it's not a past violation and the judge could address it. On the timeliness violation that you're addressing, let me talk about that for a minute. First of all, there do we have to actually do audiological evaluations at all? Do we have to actually make sure that they happen? That's kind of number one. Number two, if we do, do we have to do it in any kind of timeframe? And number three, what is that timeframe? Those would be the three issues. They don't really challenge the second and third issues on appeal. And they really didn't do that below either because that's where we thought this whole, we call that the timeliness violation. That's where we thought this whole argument was going to go on this issue, but that's not where it went. It went to this argument that we don't have to do it at all. All we have to do is enter a referral, which I'll talk about in a minute. And once we do the referral, our hands are clean. We're washed. We have no responsibility whatsoever. That's, you asked the question about both of you about whether what's their position. If you read their brief, their position is we have zero responsibility once we make that referral. Okay. Counsel was just saying, well, maybe we have to re-refer, maybe we have to do these other things. They don't say any of that in the brief. What they say in the brief is we have to do zero. Let me follow up with you on that. Okay. If that's all fair, my question for you is, should our court, should our court have a concern about affirming an injunction? And now let me put it, put it in a way that you might not agree with, but it's your answer that I want to hear. Affirming an injunction that is impossible to comply with. Right. And IDOC, again, never argued it was impossible to comply with the law. So I think that, I think they've waived that argument. And we, and we don't believe it is impossible. Also those two issues, the, so the, the second issue that I mentioned, this issue of do they have, if the agreement doesn't say they have to do it in a certain time, do they have to do it within a reasonable time? That second issue is answered by Illinois law. It's crystal clear. If, if agreement says you have to do something, but there's no time provided, you have to do it within a reasonable time. The timeframe is implied. That's, that's black letter law under Illinois law. They don't contest that. They can see that. They say, yeah, that would be the law if we had to do it, but we don't have to do it at all. So that's not the law. Let me interrupt you. On the third, hold on a second. Let me interrupt you. Okay. So is your point, Hey, look, they got it. They're the ones that are on these terms. Then, you know, they've, they've got to, you know, live with the table setting that they've set up here. And if they're not making the argument that 90 days is an impossibility, well, that's on them. It's not on the court. Exactly. That's exactly right. And they had also, not only did they, they've waived it before this court, they waived it below as well. They just didn't make that argument in response to our motion to enforce. They had two pages at the back of their brief. They didn't argue impossibility. We can't do this. They said plaintiff's counsel underestimates how much work this takes to get audiologists. That was like the title of their last section in their brief. But the judge found, if you read the judge's opinion, he said, look, you haven't given me any meat and potatoes on that. There's, there's nothing in the record that supports your supposed claim that this is difficult. You're not even arguing it's impossible. And the other reason why this court should not consider any of those issues, including the COVID issue your honor raised is because, not only because they've waived all that, but because those are issues for the district court to resolve. Those are factual issues. That's where we need to find out what has IDOC done? Has IDOC acted reasonably to try to get audiologists line up to do this? Have they, are they having substantial difficulty? Is COVID impacting them? All those kinds of factual issues that go into what should the deadline be? We argued it should be 60 days. The judge found 90 days. IDOC took no position below and takes no position on appeal on that. They had every opportunity to argue that below and they never argued it because they just claimed judge, you can't tell us to do anything. All we have to do is make this referral and we're done. We don't have to actually then follow up on the referral and make sure that it's actually done. Council is now in response to questions you're asking saying, well, maybe we would have to do a re-referral. Maybe we'd have to do this. Maybe we'd have to do that. Well, that's not in the, uh, that's nowhere in the agreement anywhere. And she's making that up as she goes along. Uh, I'm not sure what they think they have to do, but they've taken the position in the brief that they have to do zero. That's their position. Yes, Judge. Um, suppose, uh, we accept the view that, uh, you do not have, that the, uh, the jury here really did not foresee setting a deadline for the, um, referral. But we also agree. I mean, it's not really a question. As a remedy for having sent these people to the wrong professional person, does the court have greater authority to impose a deadline, at least with respect to the 700 people who, uh, were sent to this other profession? Uh, on that? Yes, Judge. I believe on that. As a remedial tool. Absolutely. Whether it was deliberate or not, you can fix it and fix it in 90 days. Yes. And that's the, first of all, on the first violation, the LHID violation, that's within the court's power pursuant to the provision, the agreement that says the court can fashion what fashion, whatever remedies are needed, including injunctive relief in order to get IDOC in compliance. And the court has very broad authority there under that provision. But secondly, uh, um, on the second violation, the willfulness, the timeliness violation, um, I really need to address this factual point. This, this idea of a referral, this idea of a referral in a private context where you, you, you refer somebody out to a physician and you say, Hey physician, would you please do this? This is a directive and IDOC doesn't have to use outside people. They keep talking about this. Like it's outside people over whom they have no control. The language of the referral in the, in the agreement has to be considered in light of three contexts, one factual, two legal, and three, the entire context of the agreement. And I appreciate the opportunity to address those three things briefly. Factually, IDOC doesn't have to use outside people. There's nothing in the agreement that says they have to do that. They could use inside people if they use inside people. I think we'd all readily see a nurse who IDOC has some medical staff in house. Sometimes a nurse who's IDOC's employee actually does the referral. And, and then there's, and then, you know, the referral ends up going to some doctor that IDOC contracted with through, through its, uh, Wexford, the entity it uses for all these services, but it doesn't have to be that way. IDOC has admitted it considered hiring an in-house audiologist. What if they do that? What if they hire an in-house audiologist? Then you have one IDOC employee referring this patient to another IDOC employee and his IDOC physician. That's all we have to do is one of our employees tells another employee to do it. And that's enough. We don't actually have to do it then. I think we'd all agree that would be absurd. The only overlay they put on that as well, we're actually using all these outside parties. That's their choice. And they still are in a hundred percent control of that relationship because they decide how many audiologists they hire. Do they hire one? And then we're jammed up from here to kingdom come on these appointments because they didn't hire enough people, or do they hire 50 that can get this done in a reasonable timeframe? That's up to them. Under what conditions do they offer these people to work? What do they pay them? When, what time, how soon do they get paid? All these other kinds of things. Those people are 1000% in IDOC control. The notion that they're out of IDOC control is a complete fallacy. IDOC controls the whole thing. So in that context, this isn't a referral in a, in a private context. These people are in custody. The inmates have no choice. The doctors work for IDOC, either whether they're in-house people or whether they're outside contractors. And IDOC is directing them to do a procedure and they can't throw up their didn't do it. So we're not responsible. That leads to the legal context. IDOC, as we put on our brief is 1000% responsible, even when they use outside contractors for the legal, uh, for the medical care of their inmates, 100% responsible. So they have to take responsibility for those people in light of that, you know, because they're 100% in control of the situation, they're 100% legally responsible for the situation. This, the, the, the, the notion that they paint that we're just referring it to some outside party and what that outside party does. Well, it's kind of up to the outside party and we just cross our fingers and hope it happens. That is in no way, shape or form what the parties bargained for here. And the district court judge knew it because he was intimately involved in the settlement. As a matter of fact, he, the district court couldn't have approved a settlement like that. This was a class action. It had to be a fair and reasonable settlement. And if IDOC could get out of all its responsibilities by simply saying, well, we just make a referral and then we cross our fingers and hope it happens. And we have no responsibility after that. That's a ridiculous situation. That's not a proper interpretation of the agreement under the facts of what a referral means here. And the legal concept of the referral in that setting where IDOC remains 1000% legally responsible for all the medical care and the last provision. You say that, but what can the Department of Corrections do to the audiologists who don't meet the 90 day requirement? Well, again, they can hire enough audiologists to make sure that they have plenty of time. It's up to IDOC, not the audiologists when they bring it to the audiologists, right? They could contract with these people and say, we need these done. When you do the referral, you have to do them within 30 days and you have to commit to that. Is that in the agreement? No, we don't know what's in the agreement. It's up to IDOC to make those agreements. That's the point. They control it. And they say they control what the people are paid, whether that's industry standard, how much they're paid, what their working conditions are. And so if they're having trouble getting audiologists, maybe it's because they're not doing a reasonable job in trying to do that. That's a job for the district court to assess and gather information on factually, not this court. But IDOC clearly has to not just make the referral, but follow up and make sure that the referral is, that the procedure that they've ordered to be done, the referral is really an order. And it's really a self-referral. It's a referral from IDOC to itself to do this procedure, regardless of whether they're using in-house people or outside people. They control legally and factually all those folks. And so it's a self-referral that they, so the idea that they can just refer it to themselves and say, well, I made the referral to myself, but now I don't have to do it. That's ridiculous. That cuts the legs out of the entire settlement agreement. It undercuts all the rights that the inmates get under the agreement. And it's in no way the district court well knew that's not what was intended here. That we have a detailed settlement agreement and everything turns on these people being defined as deaf and hard of hearing. And they're only defined as deaf and hard of hearing if they get this And so the IDOC can't just say, well, we don't have any responsibility for that. We just referred to somebody that we contracted with and, you know, we'll cross our fingers and see what happens. That's not what anyone anticipated when this agreement was signed. And that's not a fair or appropriate reading of the agreement. Thank you. Thank you. Quick points, Your Honor. First, opposing counsel just said, we don't know what's in the agreement. We do know what's in the agreement. And this court gives effect to the plain text of the agreement. The agreement does not require the department to hire a staff audiologist and the department did not have any staff audiologist when it signed this agreement. Instead, the department refers inmates to audiologists that have contracted with Wexford to accept these appointments. And while counsel's fears are founded on the false premise that the department will simply sit back and hope that the evaluations happen under paragraph 14 of the agreement, the department has agreed to make reasonable efforts to get the results of the audiological evaluation. So it has agreed to do with what's within its control. Second, counsel said that the inmates are only identified as deaf and hard of hearing at the audiological evaluations. That is incorrect. As paragraph 22 of the agreement makes clear, they are identified as deaf or hard of hearing at the first step, the hearing screening. And as we explained in our brief, and plaintiffs know make no attempt to rebut, there are a host of benefits that are accorded to inmates who are identified as deaf and hard of hearing. And that's explained at page 30 to 31 of our brief. Third, it is not our position that the evaluations will simply not happen and there's no allegation that this is occurring. Instead, plaintiffs are taking issue with the amount of time it is taking for these evaluations to occur. To the extent this court would like to reevaluate the 90-day deadline, the magistrate judge did express his concern that the party should confer about staying this deadline if, through reasonable efforts, the department can't meet it. This would be in line with section 7 of the agreement, which provides two levels of safeguards when the department can't meet its obligations with regard to hearing specialists. And finally, and fourth, the magistrate judge himself found the licensed hearing instrument dispenser noncompliance to be a prior practice. And in his sanctions order, from pages 12 to 13, when he explains why sanctions are necessary, he explains it's because the department was in past violation. So to the extent that the plaintiffs are challenging that characterization, that would be an abuse of discretion standard of review. I would appreciate, before you finish, your reaction to my question to opposing counsel as to whether the magistrate judge had additional authority to impose the 90-day deadline with respect to the 700 individuals who had been misdirected because there had been a violation, time had been lost, and he, in fact, had to get that violation remedied. Your Honor, we don't think the judge had the authority to add a deadline, which was actually less than 90 days, I believe, or perhaps more. Sorry, it was 11 weeks. But we do believe the magistrate judge had the authority to require the department to re-refer these individuals and do everything that the referral process requires. But the problem with the deadline is that it, again, assumes that the department can control when the audiologists see these inmates, and especially right now during the pandemic, as Judge Scudder pointed out, that deadline simply is unreasonable, which is why we sought a state from this court. There are two questions, aren't there? The magistrate judge's remedial authority on, first of all, and secondly, whether he exercised it in a reasonable way. And my question was more to the first of those two questions. Does he have remedial authority to impose a deadline with respect to those who have been injured by noncompliance with the agreement, even if he did not have the authority to impose it ab initio with the initial consent decree? Yes, Your Honor, I understand and agree with that distinction. We still take the position that he lacked that remedial authority. That's because at paragraph 92 of the agreement, the parties put in a dispute resolution provision that if the parties were able to meet and confer in good faith, plaintiffs could not file a motion to enforce. And because that's what happened here, we believe the judge could not intervene to exercise his broad remedial authority. But I agree with Your Honor that there is a distinction between imposing deadlines under his remedial authority and what the agreement permits. And even now, while the plaintiff's counsel claims that things are 1,000% within the department's control, the dispute is not what plaintiffs think the department can do, but what it agreed to do in this agreement. And plaintiffs still have not been able to point to any provision in the plain text of the agreement, like those 23 other deadlines that requires the department to perform this task within certain time periods. And so for these reasons and those in our brief, we would ask that this court vacate the challenge portions of the magistrate judge's orders. Thank you, Ms. Gupta. Thanks to both counsel, and we take the case under advisement.